COMMONWEALTH *vs.* PATRICIA GOODMAN
(and five companion cases[1]).

No. 00-P-909.

Suffolk. December 6, 2001. - April 4, 2002.

Present: LAURENCE, GILLERMAN, & GRASSO, JJ.

*Witness,* Expert. *Evidence,* Expert opinion, Qualification of expert witness, Joint venturer, Statement of codefendant, Scientific test, Failure to produce evidence. *Practice, Criminal,* Loss of evidence by prosecution, Required finding.

At a criminal trial, the judge did not fail to perform his "gatekeeper role" of determining whether the basis for an expert witness's opinion was sufficiently reliable, where the expert's opinion depended on common sense observations rather than esoteric scientific theory, and the judge could therefore look to his own common sense, as well as the depth and quality of the expert's education, training, experience, and appearance in other courts, as relevant both to the expert's reliability and to the helpfulness to the jury of the expert's opinion. [386-391]

At the criminal trial of two defendants, the admission of one defendant's deposition testimony from a related civil action did not violate the other defendant's right of confrontation, where the testimony was largely repetitive of other testimony, and where the deposition was given at a time when the interests of the defendants were still closely bound together, tending to ensure the reliability of the statements. [392-393]

The judge in a criminal case did not err in admitting the opinion testimony of an expert witness, where the expert's opinion was based on his own observations and his deductions from those observations, and not on laboratory tests made on evidence that the prosecution had subsequently lost. [393]

There was sufficient evidence at the trial of indictments alleging the burning of a building to persuade a rational jury beyond a reasonable doubt that one defendant was present at the scene of the crime, with knowledge that the other defendant intended to commit and was committing the crime, and that the first defendant, by agreement, was standing by ready and willing to help if necessary. [393]

INDICTMENTS found and returned in the Superior Court Department on October 1, 1996.

[1]Three against Wendell Clark and two against Patricia Goodman.

The cases were tried before *Patrick J. King,* J.

*Anne O'Reilly* for Patricia Goodman.

*Angela G. Lehman* for Wendell Clark.

*Susanne Levsen Reardon,* Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. At nine seconds after 6 P.M. on February 15, 1996, a fire alarm operator for the Boston fire department received a computer reading from the Boston police department requesting fire department assistance at 110 Blue Hill Avenue, the location of a retail dry cleaning business owned and operated by the defendants. The defendants arrived at the fire scene at about 7:10 P.M. Patricia Goodman (Patricia)[2] told Christopher Sloan of the Boston fire department investigative unit that the business had been in family ownership for nineteen years and that she and Wendell Clark (Wendell) had left the store that evening at 5:57 P.M.

On October 1, 1996, a Suffolk County grand jury returned indictments against each defendant for one count of burning a building, see G. L. c. 266, § 2, and two counts of injury to a firefighter resulting from a criminal offense, see G. L. c. 265, § 13D$^{1}$/$_{2}$, because two firefighters had been seriously injured as they attempted to suppress the fire. In response to special questions, the defendants were found guilty as joint venturers on all charges. We affirm the judgments.

1. Patricia joins in Wendell's argument that the Commonwealth's expert, Daniel Slowick, should not have been allowed, over the defendants' objections, to give opinion testimony regarding the cause of the fire. Relying on the line of cases from *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), to *Canavan's Case,* 432 Mass. 304, 313 (2000), the defendants claim that the judge failed to subject Slowick's opinion to an analysis under principles stated in *Commonwealth* v. *Lanigan,* 419 Mass. 15, 25-26 (1994); that is, he failed to perform his "gatekeeper role" of determining whether the basis for Slowick's opinion was sufficiently reliable.

---

[2]As is our practice, we use the defendant's name as it appears on the indictments.

We set out the background. The case was called for trial on Monday, February 22, 1999. The judge described for the record a lobby conference with counsel "to discuss the implication of [an earlier] order [by a different judge] prohibiting the Commonwealth from offering" opinion testimony of the Commonwealth's expert regarding "the chemical analysis that was done [by the police] on certain material found at the scene of the fire, which materials were subsequently lost by the Commonwealth." A discussion followed, during which counsel for Wendell said he had filed a motion in limine to preclude the testimony referred to in that earlier order. The judge said he would hear the testimony in the afternoon and then rule on whether the testimony was admissible. No mention was made by the judge or by either party regarding the necessity of a *Lanigan* analysis.

As agreed, Slowick testified at length in the afternoon session. After describing his experience, which was extensive, and his qualifications, which were unchallenged, Slowick described how he conducted his investigation of the fire:

> "The inspection of the fire scene is a very methodical examination, beginning on the outside of the building and then ultimately reaching the interior of the building. *My company and the National Fire Protection Association, which is a leading organization with respect to fire prevention and fire protection standards, has established certain guidelines.* The guidelines were in effect when this particular investigation was conducted. Those guidelines basically state that, again, the investigation starts on the outside and ultimately works to the inside." (Emphasis supplied.)

Slowick then described his investigation of the outside of the building: creating a "basic diagram" of the building, taking photographs, and noting where the utilities entered the building and the type of doors and windows. A computer assisted diagram was created by transfering the diagram prepared by Slowick. "Again, following the normal guidelines for the investigation of a fire, the next thing that I did was inspect[] the doors and

windows for any evidence of forced entry prior to the fire." No such evidence was found.

Slowick then entered the building and went directly to the basement. He inspected the heating systems and the distribution panels and "looked for any evidence of fire damage." He found "no fire damage whatsoever in the basement." He proceeded up to the first floor where, he testified, he followed "the normal procedures . . . [by beginning] at the area of least damage and work[ing] to the area of greatest damage." By observing the progression of the melted plastic bags that covered the clothes, he saw "which way the fire was progressing through the store."

These observations led him to the back of the building, an elevated area which was up four or five steps and was the cleaning area. There he saw "good burn patterns on the walls to indicate which way the fire was spreading." These observations led to the point of origin "where [upon examination of the reconstructed scene] there was really nothing . . . to start the fire." After examining and rejecting possible electrical causes for the fire, he observed that the floor itself, at the point of origin, "was burnt down," creating a "beveled area" about a foot long and "extend[ing] up and out from the wall."

These observations indicated to Slowick that there "was a very intense fire at that location." He explained. The National Fire Protection Association has a "rule of thumb . . . that you'll get a penetration on a standard piece of wood of about three-quarters of an inch an hour. So, if we are looking at this thing as being an accidental fire with three-quarters of an inch penetration, we are looking at maybe half an hour to three-quarters of an hour . . . burning . . . . But, . . . there are other indicators to me that pointed to a very fast fire and a very hot fire." Those "indicators" were "a very small area where the fire was concentrated and, yet, a lot of heat a very large amount of heat in that building. . . . There was no other fire damage to this extent anywhere in that building." After his observations excluded the possibility of an electrical fire, Slowick was of the

opinion "that this fire was caused by arson, . . . this fire was deliberately set."[3]

The cross-examination of Slowick yielded the following information. When asked for the "scientific theory behind" his opinion, Slowick answered, "The science, basically, is a comprehensive analysis of the burn patterns to determine where the fire started." When asked about "literature" on the subject, Slowic replied that there was such "literature" and that he had written some. The cross-examination went on to other subjects having to do with Slowick's experience and then ended. The cross-examination occupies two pages of the transcript.

The voir dire having concluded at that point, defense counsel thereupon moved to exclude Slowick's opinion that the fire was deliberately set on the ground that the Commonwealth had failed to show that the "underlying scientific theory behind the witness's testimony is generally accepted within the relevant scientific community and by showing that his theory was reliable."[4] Counsel directed the judge's attention to *Commonwealth v. Sands*, 424 Mass. 184, 185-186 (1997), released two years before trial. *Sands* held that the results of a particular sobriety field test were erroneously admitted because the underlying theoretical assumptions of the test were "not within the common experience of jurors," and, consequently, that "there must be an evidentiary foundation in satisfaction of the *Lanigan* standard." *Id.* at 188. However, earlier in its opinion, *id.* at 186, the court explained its reasoning:

> "Expert testimony on the scientific theory is needed if the subject of expert testimony is beyond the common knowledge or understanding of the lay juror. *If jurors can evaluate an expert's testimony with common sense and experience and can understand the underlying methods or theories of the testimony, then the expert's qualifications*

---

[3]Slowick relied, in part, on a conversation he allegedly had with Richard Splaine of the Boston fire department investigating unit. See section 3, *infra.* Splaine testified that no such conversation occurred. The disagreement certainly affected Slowick's credibility, but that was a matter for the jury. Further, the contradiction was emphasized in defendants' closing argument.

[4]Defense counsel also objected to the admission of Slowick's opinion at the trial, preserving the claimed error.

*and the logical basis of the testimony can be effectively
tested through cross-examination and rebuttal evidence"*
(emphasis supplied).

The judge in the case before us ruled as follows: "[B]ased
upon the credible testimony from this witness, I find that this
witness is well qualified to give the types of opinions that he
purports to give in this case. Also I find that he has an
independent basis for his opinion aside from the clinical or
laboratory tests of the materials that have been lost in this case.
For this reason, I will allow him to testify and to give his
opinions. Of course that is subject to cross-examination by
defense counsel." The defendants objected, and the judge stated
that the rights of both defendants were preserved.

There were later developments that bear on the *Lanigan* issue.
On March 23, 1999, slightly more than a month after the trial in
this case, the United States Supreme Court decided *Kumho Tire
Co.* v. *Carmichael,* 526 U.S. 137 (1999), and held that *Daubert*-
type questions must be addressed "where an expert relies 'on
skill- or experience-based observations.' " *Id.* at 151 (citation
omitted). *Kumho Tire* was cited and followed in *Canavan's
Case,* 432 Mass. at 313. Both cases are appropriately cited in
the defendants' brief on appeal, although neither *Kumho Tire*
nor *Canavan's Case* was available when this case was tried.
See *Commonwealth* v. *Figueroa,* 413 Mass. 193, 202 (1992),
*S.C.,* 422 Mass. 72 (1996) ("Retroactive application of a rule of
criminal law is indicated if (1) a case is on direct appeal or as
to which time for direct appeal has not expired when the new
rule was announced, and (2) the issue was preserved at trial"
[citation omitted]).

*Canavan's Case* followed the analytic framework of *Kumho
Tire* in reaching the conclusion that a physician's diagnosis of
multiple chemical sensitivities (MCS) was not supported by
"studies that showed the existence of MCS based on specific
symptoms and did not identify tests that can be performed to
prove that a patient suffers from MCS." 432 Mass. at 315.
*Canavan's Case* emphasized that the fact that "a person quali-
fies as an expert does not endow his testimony with magic

qualities" and that there is "no logical reason why conclusions based on personal observation . . . should not be subject to the *Lanigan* analysis." *Id.* at 313. However, the court, citing *Sands* (see discussion, *supra*), also emphasized that the "[a]pplication of the *Lanigan* test requires flexibility . . . [and that while] *Lanigan* . . . established various guideposts for determining admissibility including general acceptance, peer review, and testing . . . [, e]stablishing the reliability of personal observations may in some circumstances *require examining other criteria*" (emphasis added). *Id.* at 314 n.5.

The foundation for Slowick's methodology here, promulgated by Slowick's company in conjunction with the National Fire Protection Association, was simplicity itself: examine the exterior of the facility for external causes and, finding none, examine the interior of the building to locate the origin of the fire *by following the burn patterns*. Once the point of origin of the fire is located, the area surrounding that point is examined to determine the cause of the fire. Slowick testified to having done precisely that.

One may complain of the absence of an adequate description of the National Fire Protection Association by Slowick at the voir dire and at the trial, and one may criticize the failure of the Commonwealth to produce the actual "guidelines" that Slowick referred to in his testimony, but in matters which, as in this case, depend so heavily on common sense observations, not on a hypothesis for explaining phenomena as in esoteric scientific theory, the judge can properly look to his own common sense, as well as the depth and quality of the proffered expert's education, training, experience, and appearance in other courts,[5] as relevant both to the expert's reliability and to the helpfulness to the jury of that expert's opinion — the touchstones of the inquiry. See *Lanigan*, 419 Mass. at 25. We conclude that the testimony the judge heard from Slowick was adequate to justify the admission of Slowick's opinion testimony.

[5]Slowick's training and wide experience in the investigation of fires and explosions, and the fact that he had qualified as an expert in Canada and nine other States, including New York, New Jersey, and Pennsylvania, easily qualified him as an expert (and the judge so ruled without challenge by the defendants).

2. Wendell argues, for the first time on appeal, that the admission of Patricia's deposition testimony violated his constitutional right of confrontation under *Bruton* v. *United States*, 391 U.S. 123 (1968). We review only under the standard enunciated in *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).[6] See *Commonwealth* v. *Amirault*, 424 Mass. 618, 649-651 (1997).

There was no error, much less a substantial risk of a miscarriage of justice. The fact that Patricia and Wendell left the store only three to four minutes before the fire was reported to the police permitted the jury to find that the defendants were the only ones who had the opportunity to set the fire. That fact, coupled with the strained financial circumstances of the defendants, an aborted $35,000 sale of the business, a $100,000 fire insurance policy, and the opinions of Slowick and of Richard Splaine of the Boston fire department investigating unit that the fire was set,[7] was sufficient to support the conclusion that the admission of Patricia's deposition testimony, which was largely repetitive of the statements that Patricia and Wendell had earlier made to Splaine, did not create a substantial risk of a miscarriage of justice. Further, Patricia's deposition testimony (in the defendants' civil claim against their insurer), at which Wendell was present, was given before the indictments were handed down, and when the interests of the defendants (whom the jury found to be joint venturers) were still "closely bound together, tending to ensure the reliability of their statements." *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 863 (2000), quoting from *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 545 (1990). "[S]tatements by a joint venturer are admissible against a defendant when the statements were made 'during the pendency

[6]Counsel objected only on the grounds of relevancy, precluding appellate consideration of other possible grounds of appeal. See *Commonwealth* v. *Tyree*, 387 Mass. 191, 213 (1982), cert. denied, 459 U.S. 1175 (1983).

[7]Five days after the fire, the Clarks were interviewed by Splaine. The Clarks told Splaine that they were two months in arrears on their rent, $1,000 behind in the electrical bill, and that a $35,000 sale of the business had recently been aborted by the buyer, leaving them, after the fire, with obsolete machinery. Splaine investigated the fire and was allowed to express his opinion that the fire had been set by a match.

There was also testimony by Christopher Sloan, the initial on-site investigator, that it was unusual for a fire to burn into the floor "without a liquid."

of the cooperative effort and in furtherance of its goal.' " *Commonwealth* v. *Collado*, 426 Mass. 675, 681 (1998) (citation omitted).

3. The defendants argue that Slowick's opinion testimony, admitted over their objection, was based on statements made to him by Splaine regarding the chemical analysis of wood taken from the fire scene that showed that an accelerant was present. The wood that had been tested was lost, and the test results, as noted in section 1, *supra,* had been excluded from evidence by the judge who heard the motion in limine. The trial judge declined to exclude Slowick's testimony. He stated, "I find that he [Slowick] has an independent basis for his opinion aside from the clinical or laboratory tests of the materials that have been lost in this case. For this reason I will allow him to testify and to give his opinions."

There was no abuse of discretion. As noted above, Slowick's opinion was based on his own observations of the fire scene and his deductions from those observations.

4. Finally, the judge was not in error in denying Patricia's motion for a required finding of not guilty (Wendell did not submit such a motion). The Commonwealth's evidence, viewed in a light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt that Patricia was present at the scene of the crime, with knowledge that Wendell intended to commit and was committing the crime, and that Patricia, by agreement, was standing by ready and willing to help Wendell if necessary. See *Commonwealth* v. *Blake,* 428 Mass. 57, 63 (1998). See also *Commonwealth* v. *Longo,* 402 Mass. 482, 486 (1988) ("The jury may infer the requisite mental state [for a joint venture] from the defendant's knowledge of the circumstances and subsequent participation in the offense" [citation omitted]).

*Judgments affirmed.*